UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ANGEL LUIS RODRIGUEZ,                    :
                                         :
            Petitioner,                  :
                                         :
      v.                                 :        CIVIL NO. 3:15-CV-1952
                                         :
DAVID J. EBBERT,                         :        (Judge Kosik)
                                         :
            Respondent.                  :

**<u>MEMORANDUM</u>**

Presently before the court is a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2241 filed by Angel Rodriguez ("Rodriguez").  Rodriguez is currently

confined at the United States Penitentiary ("USP") at Lee in Jonesville, Virginia.  At

the time he filed the petition, Rodriguez was confined at USP- Allenwood, in

Allenwood, Pennsylvania, located in the Middle District of Pennsylvania.  In the

petition, Rodriguez alleges that his due process rights were violated during a

disciplinary hearing conducted at USP-Lewisburg, his former place of confinement.

He was found guilty of the prohibited acts of Introduction of Narcotics (Code 111A

violation); Use of Mail for an Illegal Purpose (Code 196 violation); and Use of

Telephone for an Illegal Purpose (Code 197A violation).  (Doc. 1, Pet.)  The matter is

ripe for consideration, and  for the reasons that follow, the petition will be denied.

## I.     Factual Background

On September 9, 2014, Rodriguez was issued an incident report for conduct occurring between July 23, 2014 and September 9, 2014.  The incident report was #2626628 and was issued by Special Investigative Services ("SIS") Tech A. Hartman. An investigation revealed that between July 23, 2014 and September 4, 2014, Rodriguez attempted to orchestrate the introduction of Suboxone into USP-Lewisburg through an outside contact.  (Doc. 19, Ex. 1, Romano Dec. at ¶ 6; Attach. C, Incident Rpt.)  The incident report, attached by both Rodriguez and the Respondent, sets forth a series of coded letters and phone calls between Rodriguez, four (4) other inmates, and outside contacts which talk about Rodriguez's receipt of photographs of female genitalia concealed between pages in a football magazine.  (Id., Ex. 1, Attach. C at 2-4.)  Mail was subsequently intercepted by the SIS which contained strips of Suboxone concealed between pages in football magazines and under postage stamps. (Id.)

Rodriguez was charged with the introduction of narcotics into the facility, as well as the use of the telephone and the use of the mail to further criminal activity.  He received a copy of Incident Report #2626628 on September 9, 2014, from Officer Waughen.  He made no comments to the investigating officer, and on September 10, 2014, he again made no comment when he appeared before the Unit Discipline Committee ("UDC").  (Id. at 3-5.)  On September 10, 2014, the UDC forwarded the

incident report to the Discipline Hearing Officer ("DHO") due to the severity of the charges, but further action on the incident report was suspended pending referral to the FBI for possible criminal prosecution.  (Id. at 4; Attach. D, Excerpt from PS 5270.09.) The Incident report was released for administrative processing on October 22, 2014. The following day, Rodriguez again appeared before the UDC, who again referred the matter for a DHO hearing.  (Id., Ex. 1, Attachs. E, F at 9.)

On October 23, 2014, Rodriguez received the Notice of Discipline Hearing before the DHO and Inmate Rights at Discipline Hearing forms.  (Doc. 19, Ex. 1, ¶ 6; Attach. G, H.)  While Rodriguez refused to sign these forms, the Notice of Hearing form does reflect that Rodriguez requested that inmates Armstrong, Mungia and Estevez serve as witnesses along with staff member C. Rothermel.  (Id., Attach. H.)

A DHO hearing was thereafter conducted on November 12, 2014.  (Doc. 19, Attach. F, DHO Rpt.)  It was first confirmed at the hearing that Rodriguez had received advanced written notice of the charges against him.  (Id. at 9.)  Because the staff member originally selected by Rodriguez to serve as his staff representative, Ms. L. Lyons, was no longer employed at USP-Lewisburg, Rodriguez chose another staff representative who appeared on his behalf at the hearing.  This staff representative, Ms. Wintersteen, informed the hearing officers that she had met with Rodriguez at his cell before the DHO hearing, and that she had reviewed all of the documentary

3

evidence in the matter prior thereto and during the hearing.  (Id. at II(C)(E).)  It was noted in the DHO Report that the staff representative also stated that she reviewed the recorded telephone calls made by inmate Hurst and Estevez.  She also stated that Rodriguez made no specific requests of her as a staff representative in this case.  (Id. at II(E).)  She stated that she had no first hand knowledge of the incident that took place in this case, and had no further information to present or statement to make regarding this case.  (Id.)

However, during the DHO hearing, Rodriguez stated that he did not receive an opportunity to meet with his staff representative in advance of the hearing.  (Id., Ex. F at 3.)  According to Rodriguez, he had a two-page list of items for the staff representative to obtain, and requested that the hearing be suspended to permit the staff representative to obtain said items.  (Id.)  Rodriguez contradicts the statements he made during the hearing that he did not have the opportunity to meet with Wintersteen before the hearing, in the memorandum of law submitted in support of his pending petition.  (Doc. 2 at 2, 14-15.)[1]

Rodriguez attaches to his habeas petition a document entitled "Items I am Requesting My Staff Rep. Ms. Lyons to Retrieve, Verify from Witnesses and Staff".

---

[1]In his supplemental traverse, Rodriguez now appears to admit that he did meet with his newly requested staff representative, but that she refused to obtain the documents he requested.  (Doc. 26 at 4.)

4

(Doc. 1-1 at 10-15.)  In said document, Rodriguez requests the following:

> (1)   SIS confirmation that he was placed in a medical cell on August 4, 2014, strip searched, and not permitted to have writing materials for the first five days in the cell to show that he could not have written a letter to his fiancé on that date;
>
> (2)   Interviews of inmates Armstrong, Mungia, Estevez and Hurst;
>
> (3)   Interview of Case Manager Rothermel concerning the suspension of the incident report after the UDC hearing on September 10, 2014; and,
>
> (4)   Verification from the publisher of a magazine to show that it was mailed directly to Rodriguez to prove that his fiancé did not send him sexually explicit photos concealed within the pages of the magazine.

(Id.)  Also attached to the habeas petition is a statement authored by Rodriguez entitled, "I Plead Not Guilty to All Charges" in which he requests that inmates Mungia and Armstrong appear as witnesses.  (Id. at 16-21.)

The DHO Report reveals that Rodriguez submitted two (2) written statements, three (3) letters and one hundred and forty (140) pages of legal documentation.  (Doc. 19, Ex. F at 8.)  At the hearing, Inmate Estevez testified.  (Id. at 6.)  Also, the DHO interviewed inmates Armstrong, Mungia and Hurst with respect to the matters identified in Rodriguez's statement.  (Id. at 6-7.)  Unit Manager J. Adami, Officer K. Bower, Officer E. Gee and Case Manager Rothermel were also interviewed by the

DHO.  Although Officer D. Bullington was unavailable, the DHO deemed his testimony unnecessary in that he would only be presenting repetitive evidence of what was said by the other staff members that were interviewed.  (Id. at 7.)

It was noted at the beginning of the hearing by the DHO that a procedural error had occurred in this case.  Specifically, the investigating lieutenant forwarded the incident report to the UDC on September 10, 2014, before the incident report was suspended for FBI referral.  (Id. at 9.)  But, it was determined by the DHO that Rodriguez did not suffer any due process violation based on the foregoing, because his ability to defend himself was not impeded in that he had made no comments to either the initial investigating lieutenant or the UDC.  It was further noted by the DHO that the error happened well before the 24 hour period prior to the DHO hearing.  (Id.)

Rodriguez testified at the DHO hearing that he could not have written a letter to his fiancé on August 4, 2014, because he had been moved to a new cell on the date of the letter, and did not have a pencil and paper for five days.  (Id. at 1.)  He stated that inmate Armstrong never brought any drugs into the institution, but only wrote to his fiancé as a pen pal.  Rodriguez further states that he did not know inmate Mungia, and that inmate Hurst was only giving his fiancé betting lines on the phone.  (Id.) Rodriguez further states that Suboxone is not a drug, and that the magazine in which the Suboxone was discovered by the SIS was sent directly from Barnes and Noble to

6

the institution.  (Id.)  The testimony given at the DHO hearing by inmate Estevez was that he made a phone call as a favor to Rodriguez, and that it was "concerning legal work."  (Id. at 6.)

With respect to the staff members and inmates interviewed by the DHO (id. at 6-7), the three staff members contradicted Rodriguez's testimony and informed the DHO that Rodriguez had access to writing materials on August 4, 2014.  Inmate Armstrong states that he knew nothing about any drugs and only wrote to Rodriguez's girl (Maria Tavarez) "to get a pen pal."  (Id.)  Inmate Mungia remained silent and refused to state whether he knew Rodriguez.  Mungia did state, "I didn't know who was sending me that stuff (Suboxone)" and that "Suboxone is not an illegal drug, it is a medication."  (Id.)  Inmate Hurst stated, "I called her (Maria Tavarez) because I was running a gambling ticket for the baseball lines.  I don't even know what Suboxone was.  Once I realized what was going on, I stopped."  (Id.)

Based on the foregoing, the DHO determined that Rodriguez had committed the prohibited acts as charged.  (Id. at 9-15.)  The evidence considered and relied on was as follows.  First, the DHO considered the written report of the SIS Technician, which detailed the communications of the individuals involved in the conspiracy to introduce Suboxone into the prison.  The Incident Report lays out by date beginning on April 16, 2014, and continuing into August of 2014, the details of what took place in this action.

7

The court will not repeat it all herein, but the report sets forth what happened, by whom, and on what specific date.  (Doc. 19, Attach. C, Incident Rpt.)

The DHO noted Rodriguez's denial of the charges and each of the defenses he presented in his statements.  However, although Rodriguez claimed he could not have written the letter to his fiancé on August 4, 2014, the DHO notes that the staff member witnesses all state that Rodriguez had access to writing materials on said date.  (Doc. 19, Attach. F at 12.)   It was also concluded by the DHO that inmate Armstrong had written to Maria Tavarez (the fiancé of Rodriguez) with a desire to obtain Suboxone, noting that the code word "Nancy" was consistently used by Rodriguez and other inmates to introduce Suboxone into the institution.  While Rodriguez claims that Armstrong did not receive Suboxone, this is unproven and did not discount the culpability on the part of Rodriguez.  Rodriguez's repeated testimony that Maria Tavarez never sent Suboxone to Armstrong was found by the DHO to be an attempt to protect his fiancé.  (Id.)

While the DHO found that inmate Hurst did obtain baseball betting information from Maria Tavarez during their phone call, the two had communicated in code in the beginning and the end of their conversation with respect to the introduction of Suboxone into the institution.  (Id.)  It was noted by the DHO that during this monitored phone call, inmate Hurst was reading from a script provided by Rodriguez,

8

and also communicating with Rodriguez during the call.  The DHO found no support for Rodriguez's claim that Hurst and Tavarez were talking about reading books sent to Hurst by his uncle.  The DHO concluded that the greater weight of evidence supported the conclusion that the call between Hurst and Tavarez was with respect to introducing Suboxone into the prison.

Rodriguez was not found to be credible with respect to the statement that he did not know inmate Mungia.  The DHO found that both inmates used the code words "birthday cake" when they wrote to Maria Tavarez, and referred to photographs of female genitalia discovered between the pages of a football magazine.  This information could not be intercepted on an inmate-to-inmate note.  The DHO also did not find Rodriguez's statement credible because Mungia later received a football magazine with Suboxone inside, Mungia was housed across from Rodriguez's cell at the time of the misconduct, and both inmates testified that Suboxone was not an illegal drug.  (Id. at 13.)

While the DHO did agree that the legal documentation submitted by Rodriguez established that Maria Tavarez performs legal functions for him, the DHO concluded that the greater weight of evidence also showed that Tavarez mailed Suboxone to other inmates at the institution at the request of Rodriguez.  (Id.)  There existed no evidence to support Rodriguez's claim that he was set up by the SIS, and his claim that the

Suboxone was sent to the prison from Barnes and Noble was found to be unbelievable. In addition, the DHO found that Rodriguez's claim that he communicates with his fiancé Maria Tavarez using code words to be a partial admission of the commission of a prohibited act, particularly because the same code words were used by Tavarez when communicating with inmates Armstrong, Mungia, Hurst and Estevez to relay secretive information back to Rodriguez.  (Id.)

Rodriguez claimed that he did not commit the prohibited act of phone abuse in that he did not make any of the calls referenced in the Incident Report.  While this was considered, it was found by the DHO that making plans to commit phone abuse was treated the same as committing the prohibited act, and that the evidence in this case supported a finding that Rodriguez had orchestrated the introduction of the Suboxone to the facility and abetted it through the inmates and their use of the phone to contact his fiancé.  (Id.)

Little weight was afforded by the DHO to Armstrong's testimony that he wrote to Maria Tavarez as a pen pal.  Armstrong had been found guilty of mail abuse in this case, and had used the same coded messages as Rodriguez.  Further, Armstrong and Rodriguez appeared to have rehearsed their denials as well.  (Id.)

Estevez was also found guilty of phone abuse in this case.  The DHO gave very little weight to his testimony that he called Tavarez for Rodriguez concerning legal

work, because Estevez used the code words during the conversation with Tavarez to send Suboxone into the prison.  (Id.)

It is further noted that inmate Mungia was previously found to have introduced Suboxone into the institution for Rodriguez.  In addition, both inmates testified that Suboxone was not an illegal drug.  This testimony by both lends credibility to the existence of a conspiracy to introduce Suboxone into the facility.  (Id.)

The DHO also considered inmate Hurst's statement that he stopped calling Tavarez when he realized what was going on.  This was used by the DHO as evidence that supported the conclusion that Rodriguez committed the prohibited acts he was charged with.  (Id. at 14-15.)

In addition to the forgoing, the DHO noted Rodriguez's history of introducing narcotics into USP-Canaan and USP-Lewisburg in the past.  This was used to draw an adverse inference against him for introducing Suboxone into the prison in this case.  It was therefore concluded by the DHO that Rodriguez committed the charged prohibited acts of Introduction of Narcotics (Code 111A), Use of Mail for an Illegal Purpose (Code 196), and Use of Telephone for an Illegal Purpose (Code 197A). (Id.)

As a sanction, for each of the three (3) offenses, Rodriguez lost forty-one (41) days of good conduct time, and received ninety (90) days disciplinary segregation and

11

the loss of privileges.  He also received a $500 monetary fine for the Code 111A

offense that is authorized by Bureau of Prison policy.  (Doc. 19, Attach. J, Program

Statement 5270.09 excerpt.)  One of the claims in Rodriguez's petition is that he

lacked sufficient funds in his account to support the imposed fine.  However, on

November 18, 2014, the encumbrance for the fine was posted, and Rodriguez had an

inmate account balance of $1,279,41.  (Id., Attach, K, Inmate Statement.)

## II.    Discussion

While Respondent does not believe the Rodriguez has properly exhausted his

administrative remedies, he does not pursue the exhaustion argument and has decided

to address Rodriguez's claims on the merits.  (Doc. 19 at 3, n.2.)

The Bureau of Prisons ("BOP") disciplinary process is fully set forth in the

Code of Federal Regulations ("CFR"), Title 28, Sections 541 through 541.8.  These

regulations dictate the manner in which disciplinary action may be taken should a

prisoner violate institutional rules.  The first step requires filing an incident report and

conducting an investigation.  Staff are required to conduct the investigation promptly,

absent intervening circumstances beyond the control of the investigator.  See 28

C.F.R. § 541.5.  Following the investigation, the matter is then referred to the UDC for

a hearing pursuant to 28 C.F.R. § 541.7.  If the UDC finds that a prisoner has

committed a prohibited act, it may impose minor sanctions.  If the alleged violation is

serious and warrants consideration for more than minor sanctions, or involves a prohibited act listed in the greatest or high category offenses, the UDC refers the matter to a DHO for a hearing.  Id.

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974.)  Greatest category offenses carry a possible sanction of loss of good conduct time credits.  When a prison disciplinary hearing may result in the loss of good conduct time credits, due process requires that the prisoner receive the following:  (1) the right to appear before an impartial decision-making body; (2) written notice of the claimed violation at least twenty-four (24) hours in advance of the hearing; (3) an opportunity to call witnesses and present documentary evidence in his or her defense when doing so would not be unduly hazardous to institutional safety or correctional goals; (4) assistance from an inmate or staff member if the charged inmate is illiterate or if complex issues are involved; and  (5) a written statement by the factfinder as to evidence relied on and reasons for the disciplinary action. See Wolff v. McDonnell, 418 U.S. 539, 563-70 (1974).  The DHO's decision is required to be supported by some evidence in the record. See Superintendent v. Hill, 472 U.S. 445, 453-56 (1985); see also Young v. Kann, 926 F.2d 1396, 1402-03 (3d Cir. 1991)(applying Hill standard to federal prisoner due process challenges to

prison disciplinary proceedings).

The determination of whether the standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  Hill, 472 U.S. at 455-56.  Under Hill, judicial review of a prison disciplinary decision is limited to ensuring that the prisoner was afforded certain procedures, the action against him was not arbitrary, and that the ultimate decision has some evidentiary support.  Id. at 457; see also 28 C.F.R. § 541.8(f) (requiring that the DHO's decision be "based upon at least some facts and, if there is conflicting evidence, on the greater weight of the evidence.").  Moreover, "[t]he sufficiency standard is met where a DHO supports a finding of culpability solely by reference to an incident report compiled by a corrections officer."  Moles v. Holt, 221 F. App'x 92, 94 (3d Cir. 2007)(citations omitted).

In his petition, Rodriguez claims his due process was violated because:

(1)     an error caused the disciplinary proceedings to be suspended
        after the investigation and hearing before the UDC were
        initially conducted;

(2)     his staff representative failed to obtain evidence and
        interview witnesses on his behalf;

14

(3)     the DHO was biased and prejudiced against him by
        permitting nine officers to sit in the hearing room who
        characterized Rodriguez as being guilty during the hearing;
        and,

(4)     the $500 sanction is improper because Rodriguez only had
        $279.41 in his account.

(Doc. 2, Pet'r Mem. of Law.)

The procedural requirements of <u>Wolff</u> and <u>Hill</u> have been met in the instant

case.  While Rodriguez claims that an error resulted in the suspension of the incident

report pending an FBI review, this did not violate his due process rights.  He made no

comments concerning the incident report to any staff member before the referral and

error, and they occurred more than two months before the DHO hearing took place.

Moreover, Rodriguez was not prevented from defending himself against the charges

lodged him.  (Doc. 19, Ex. 1, Attach F. at 9.)

Further, Rodriguez requested and was afforded a staff representative.  While at

the time of the UDC hearing he originally indicated that he wanted Ms. Lyons, she

was no longer employed with the institution and could not serve as his representative.

As such, he then requested Ms. L. Wintersteen, and she appeared on his behalf during

the DHO hearing.  (Doc. 19 at 33, Ex. F, II(B).)  Ms. Wintersteen stated that she met

with Rodriguez at his cell prior to the hearing and that she reviewed all the

documentary evidence prior to and during the hearing.  She stated that she reviewed

the recorded phone calls made by inmates Hurst and Estevez.  She also stated to the DHO that Rodriguez made no specific requests of her as his staff representative, and that she had no firsthand knowledge of this incident.  The DHO Report reflects all of this.  Moreover, while Rodriguez states that his staff representative refused to interview or obtain statements from his requested witnesses, he does not state in the petition or supporting memorandum that the DHO allowed each of the witnesses to testify, and that the DHO himself interviewed each witness with respect to the reasons stated by Rodriguez for wanting the witness.

The memorandum of law submitted by Rodriguez also contradicts his statements made during the DHO hearing that his staff representative failed to meet with him in advance of his hearing. (Doc. 2; Doc. 19, Ex. 1, Attach. F.)  Further, it is clear that the DHO received the two statements that Rodriguez claims he provided to the staff representative.  The DHO's detailed explanation of the reasons for finding Rodriguez guilty indicates that the DHO considered all of the evidence available, as well as the testimony and the witness interviews, all of which Rodriguez wanted submitted on his own behalf.  There is no evidence that Rodriguez was unable to defend himself against the charges due to an alleged failure by the representative to interview witnesses or gather evidence.  The evidence that formed the basis of the incident report was defended by Rodriguez.  He is not illiterate and was clearly able to

defend himself.  As such, the court cannot say that the staff representative failed to perform her function or that having a staff representative was even absolute in this case.

Rodriguez also alleges that the DHO was biased against him.  He bases this argument on the fact that staff members were permitted to sit in the hearing room.  He also appears to suggest that the DHO was biased because he failed to expunge the incident report.  (Doc. 2 at 20-22.)  When examining the right to an impartial decision-maker, the only persons excluded therefrom are those who have a direct personal or substantial involvement in the underlying charges.  See Meyers v. Alldredge, 492 F.2d 296, 306 (3d cir. 1974).  In the instant case, there is absolutely no evidence that the DHO in this case had any direct, personal or substantial involvement in the underlying charges against Rodriguez.  There is nothing in the record to support Rodriguez's claims of bias leveled against the DHO.

It is also important to point out that Rodriguez never questioned the DHO's decision to not require the testimony of Officer Bullington.  Regardless, the court agrees that this witness' testimony was unnecessary, as it would have been repetitive of testimony given.  See Pannell v. McBride, 306 F.3d 499, 503 (7th Cir. 2002).  Further, as Respondent correctly points out, the right to call witnesses is not absolute in any event.  Institutional safety or correctional goals take precedence.  Ponte v. Real,

471 U.S. 491, 497 (1985)(citing Wolff, 418 U.S. at 566).

Rodriguez finally claims that his monetary fine was improper.  First of all, the monetary fine of $500 does not implicate the length of Rodriguez's sentence.  But, even if it did somehow, it was authorized in this instance.  BOP policy 5270.09, Inmate Discipline Program, authorizes a monetary fine of up to $500, or 75% of the inmate's trust fund balance for greatest severity level offenses.  It can only be imposed by the DHO, and not by the UDC.  (Doc. 19, Ex. 1 ¶ 6, Attach. J.)  Although Rodriguez claims that he lacked sufficient funds in his inmate account to support the $500.00 monetary fine, he had an account balance of $1,279.41 on November 18, 2014, when the encumbrance for the fine was posted on his account as demonstrated by the Inmate Account record submitted for Rodriguez.[2]  (Id., Attach. K, Inmate Statement.)  While in his supplemental traverse Petitioner argues his "available balance" was only $279.41 due to earlier encumbrances he had placed upon him, he readily admits that the balance reflected on the relevant date revealed that he had an account balance of $1,279.41.  It is upon this balance, as reflected on Petitioner's statement, that the $500.00 fine was imposed.  There is no indication that any of the money in Petitioner's account was "frozen" and unable to be used as Petitioner argues.

---

[2] Although the DHO signed and dated the DHO Report on December 17, 2014, the hearing itself was conducted on November 12, 2014, six (6) days prior to the date the fine was posted to Rodriguez's account.  (Doc. 19, Attach. F at 1, 16.)

Based on the foregoing, it is clear that Rodriguez received all of his due process rights and that the decision of the DHO was based on "some evidence," if not the "greater weight of the evidence."   For these reasons, the petition will be denied in that Rodriguez's arguments wholly lack merit.  An appropriate order follows.